M. P. KELLY, *Plaintiff in Error*, v THE STATE OF FLORIDA, *Defendant in Error.*

Opinion filed December 17, 1919.

In a prosecution for assault with intent to commit murder in the first degree, where the evidence is legally sufficient as a predicate for a finding of an assault with intent to kill by an act of culpable negligence, which would have constituted manslaughter if death had ensued, and where the evidence would also justify a finding of an assault with intent to kill, by an act imminently dangerous to the person assaulted and evincing a depraved mind regardless of human life, although without any premeditated design to effect death, which would have constituted murder in the second degree if death had ensued, a verdict of guilty of an assault with intent to commit manslaughter will be sustained.

A Writ of Error to the Circuit Court for Gadsden County, E. C. Love, Judge.

Judgment affirmed.

*W. C. Hodges* and *J. Baxter Campbell,* for Plaintiff in Error;

*Van C. Swearingen,* Attorney General, and *D. Stuart Gillis,* Assistant, for the State.

WHITFIELD, J.—Upon an indictment for an assault with intent to commit murder in the first degree, Kelley was convicted of an assault with intent to commit manslaughter. On writ of error it is in effect contended that the verdict is contrary to the law applicable to the evidence.

The statutes provide that:

"The unlawful killing of a human being, when perpetrated from a premeditated design to effect the death of the person killed or any human being, or when committed in the perpetration of or in the attempt to perpetrate any arson, rape, robbery or burglary, shall be murder in the first degree, and shall be punishable with death. When perpetrated by any act imminently dangerous to another, and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual, it shall be murder in the second degree, and shall be punished by imprisonment in the State prison for life.

"When perpetrated without any design to effect death, by a person engaged in the commission of any felony, other than arson, rape, robbery or burglary, it shall be murder in the third degree, and shall be punished by imprisonment in the State prison not exceeding twenty years."

"The killing of a human being by the act, procurement or culpable negligence of another, in cases where such killing shall not be justifiable or excusable homicide nor murder, according to the provisions of this article, shall be deemed manslaughter, and shall be punished by im-

prisonment in the State prison not exceeding twenty years, or imprisonment in the county jail not exceeding one year, or by fine not exceeding five thousand dollars."

"Whoever, with malicious intent to maim or disfigure, cuts out or maims the tongue, puts out or destroys an eye, cuts or tears off an ear, cuts, slits or mutilates the nose or lip, or cuts off or disables a limb or member of any other person, and whoever is privy to such intent, or present, aiding or abetting in the commission of such offence, shall be punished by imprisonment in the State prison not exceeding twenty years or by fine not exceeding five thousand dollars."

"In all criminal prosecutions hereafter begun in this State, if the defendant be found guilty of an offence lesser in degree, but included within the offence charged in the indictment or information, such verdict shall not be set aside by the court, upon the ground that such verdict is contrary to the evidence, if the evidence produced in such case would have supported a finding, or if such court would have sustained a verdict of guilty of the greater offense." Secs. 3205, 3209, 3220 and 4007, Gen. Stats., 1906, Compiled Laws, 1914.

The prosecuting witness, Leroy Cowart, testified that he and another boy, Jim Bartman, were escaping from the Reform School at Marianna, and were at Quincy, and that "we went down in the woods about a half-mile away and lay down to go to sleep. Mr. Kelley, the defendant, came into the woods where we were with a shotgun, and said that he was going to carry us to jail; that he was the sheriff or was going to take us to the sheriff. I got up and started away; was walking fast away from him. Mr. Kelley told me to stop twice, and I did not stop, and

then he shot me and I fell. He came there and told me to get up and cussed at me, then he took me on towards the railroad track. When he came to a wire fence on the way, he kicked me, and told me to get over the fence and pushed me. When we got to the track he placed us on the Section Foreman's car and brought us to Quincy depot. The sheriff, Mr. Gregory, came to the depot and got us and brought us, and brought me to the Doctor's office up town, where my wounds were dressed. I stayed in Quincy two or three days and then was taken back to Reform School at Marianna. Mr. Kelley, defendant, shot me with No. 4 shot. I was about 25 yards away from him when he shot me, and the shot hit me all the way from the shoulders down to the ankle; the worst place was in the leg. Several shot went into my thigh together. I had not been trespassing or doing any harm around the section house at all. I did not break the window in the commissary there; do not know who did it. Did not cut my name on the plate at the section house."

Jim Bartman testified: "I was with Leroy Cowart at the Reform School at Marianna and escaped with him. Had been in the woods around and not far from Quincy depot for part of two days and one night, before the shooting, but had bothered nothing or nobody. Went to a house and a woman gave us something to eat for cutting wood. Went back in the woods about a half a mile from where we got something to eat and lay down to sleep. Mr. Kelley, the defendant, came into the woods where we were with a shotgun. Leroy Cowart got up and started away pretty fast. Mr. Kelley told him to stop and when he did not, shot him with the shotgun. Leroy fell; he was shot with No. 4 shot and hit in the back all the way from his shoulder to his ankle, but the worst place was in the

thigh. We went to where he was, and the defendant, Mr. Kelley, told him to get up, that he was going to carry us to jail; then carried us across the fence to the car on the railway tracks, making Leroy walk all the way, and brought us to Quincy depot where the sheriff came and took us up town to the Doctor's office, where the wounds were dressed. We stayed there two days and went back to Marianna Reform School. Mr. Kelley was about thirty yards away from Leroy when he shot him. I did not get up at all when Mr. Kelley first came, and he did not offer or try to hurt me. After Mr. Kelley shot Leroy he put another shell in his gun, and said it was buck shot and if I ran he would shoot me with them."

The defendant testified: "Living on the railroad, where we do, we are continually bothered with tramps and hoboes. Some one broke into my commissary, and they had cut initials, etc., on plate of section house. That evening some people had been around the house for awhile, and had gone to the woods, so instead of sending for Mr. Barfield, an officer, to get them, I went to the house when I knocked off from work, and got my shotgun and went into the woods for them. I came upon them in the woods, lying down. One of them, Leroy Cowart, got up and started to run away. I called to him and asked him to stop twice, and he would not. I fired the gun at him when he was about 40 yards away, shooting him in the legs. He fell, and I went to where he was and told him to get up. He got up, and with assistance went to the railway track where the car was, and I brought him on to the depot at Quincy, and had the sheriff phoned, who came there and got him and Jim Bartman. I did not intend to kill or hurt the boy seriously. I thought the gun was loaded with No. 9 shot as it was when I left it. I only had two kinds

of gun shells in my house, some large shot and some small shot. I was away from home during the latter part of December, 1918, and first days of January, 1919, and when I left and last knew about the gun, it was loaded in both barrels with No. 9 shot. Mr. Vaughn, a section foreman relieved me in my absence, and I learned later, that he had fired the gun while I was gone and it had been reloaded with No. 4 shot without my knowledge. After I fired the gun at the boy, I examined the other barrel and it was loaded with No. 9 shot. I thought the shot would just sting and sprinkle the person I shot, and that he would run away and not bother around there any more, and tell other hoboes. He was running through the woods and I never noticed the boy I shot, did not know whether it was a boy or small man; never took particular notice of the size before firing. I went down in the woods to get the parties to turn over to the sheriff. I never at any time had any intention of killing or seriously injuring the boy. Must have shot him closer than I thought, and did shoot him with larger shot, thinking the gun loaded with No. 9 shot."

J. D. Vaughn testified for the defendant: "I relieved Mr. Kelley, defendant, as section foreman at Quincy during the last days of December, 1918, and the first days of January, 1919, and lived in his house and had occasion to use his shotgun. I shot a hawk a short distance and apparently did not hurt him; he flew away. Did not shoot him over thirty yards. The gun must have been loaded with small shot as it did not seem to hurt the hawk. I possibly reloaded the gun, but am not certain. Do not remember positively whether I reloaded it or not."

The testimony is legally sufficient as a predicate for a finding that the defendant unlawfully shot Leroy Cowart

41—Vol. 41

with intent to kill him, by a means and in a manner that made the shooting an act of culpable negligence, which would have constituted manslaughter if death had ensued from the shooting. Williams v. State, 41 Fla. 295, 26 South. Rep. 184. The testimony would also justify a finding of an assault with intent to kill Leroy Cowart "by an act imminently dangerous" to him, "and evincing a depraved mind regardless of human life, although without any *premeditated design* to effect his death," which would have constituted murder in the second degree if death had ensued from the shooting. This would warrant a verdict of assault with intent to commit manslaughter, since that offense as well as murder in the first and second degrees is included in the charge, and the statute provides that if the evidence produced would have supported a finding of guilt of a higher offense in which the offense found is included, the verdict should not be set aside on the ground that it is not supported by evidence. Sec. 4007, Gen. Stats., 1906, Compiled Laws, 1914; Williams v. State, supra; Bryan v. State, 45 Fla. 8, 34 South. Rep. 243; Johnson v. State, 53 Fla. 45, 43 South. Rep. 779; Grace v. State, decided at this term.

Judgment affirmed.

BROWNE, C. J., AND TAYLOR AND WEST, J. J., concur.

ELLIS, J., dissents.

I think the evidence establishes aggravated assault only. —ELLIS.